

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CAROL A. SULLIVAN and　　　　　　　　:
BRUCE SULLIVAN, *individually and*　:
*as co-administrators of the estate of*
*Sean Sullivan,*

**FILED**

:　　　　　CIVIL ACTION
　　　v.　　　　　　　　　　　　:
　　　　　　　　　　　MAY 2010
　　　　　　　　　　　　　　NO. 07-4447
WARMINSTER TOWNSHIP, ET AL.　　MICHAEL E. KUNZ, Clerk
　　　　　　　　　　　　By_____ Dep. Clerk

**SURRICK, J.**　　　　　　　　　　　　　　　**MAY 27 2010**

**MEMORANDUM**

Presently before the Court are Defendants Warminster Township, Chief Michael Murphy,

James McCaffrey, Daniel Leporace, Christopher Springfield, Sean Harold, Ron Szymborski and

Casey Byrne's Partial Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6)

and Motion to Strike Pursuant to Federal Rule of Civil Procedure 12(f) (Doc. No. 8) and

Defendants', Warrington Township, James J. Miller, John Blanchard and Quentin Fuller, Motion

to Partially Dismiss Plaintiffs' Complaint (Doc. No. 9). For the following reasons, Defendants'

Motions will be granted in part and denied in part.

**I.　　BACKGROUND**

Plaintiffs Carol Sullivan and Bruce Sullivan filed this lawsuit on their own behalf and on

behalf of their deceased son, Sean Sullivan, who was shot and killed by police officers. The

Complaint alleges that in the early morning hours of March 31, 2006, five Warminster Township

police officers came to the Sullivans' home in Warminster, Pennsylvania, to serve a warrant on

Carol Sullivan, which charged her with various non-violent misdemeanors. (Compl. ¶¶ 23-24.)

The officers surrounded the house, and one of them drew his gun and pointed it at the front

window while another knocked on the front door, identified himself as a police officer, and stated that he was there to arrest Carol Sullivan. (*Id.* ¶¶ 25-26.) When Carol Sullivan opened the door and asked to see a copy of the arrest warrant, the officer pushed his way into the house. (*Id.* ¶ 27.) Carol Sullivan resisted and a scuffle ensued, which led the officer to subdue and handcuff her. (*Id.*) In the meantime, Sean Sullivan, who had been sleeping in a bedroom at the rear of the home, called out, while remaining behind his closed bedroom door, telling the police that his mother had not done anything wrong and to leave her alone. (*Id.* ¶ 28.) Upon learning of Sean Sullivan's presence, the officers called for backup from a special emergency response team because they had an outstanding warrant for Sean Sullivan's arrest. (*See id.* ¶¶ 30-31.) More officers arrived, including officers from Warrington Township. (*See id.* ¶ 30.) The officers urged Sean Sullivan to leave his room and submit to arrest, but he refused. (*See id.* ¶ 31.)

After a short while, Sean Sullivan climbed out of a rear window of the house. (*Id.* ¶ 32.) As he was descending to the ground he fell, but he got up and started to run from the officers. (*Id.* ¶ 32.) One of the officers fired his gun at Sean Sullivan as he fled, after which several other officers opened fire. (*Id.* ¶ 33.) In all, the officers fired fifty-six shots, six of which struck Sean Sullivan. (*Id.*) Despite suffering from multiple gunshot wounds, Sean Sullivan continued to run. (*Id.* ¶ 34.) He fell down, but got up and continued flee before finally falling to the ground as he tried to climb over a fence. (*Id.*) None of the officers rendered immediate medical assistance to Sean Sullivan after he fell from the fence, and he died from his wounds. (*See id.* ¶¶ 35-36.) Carol Sullivan, who was handcuffed in the back of a patrol car, watched as the officers shot her son. (*Id.* ¶ 37.)

On October 27, 2007, Plaintiffs filed this lawsuit against the officers, their police chiefs,

2

and their employing municipalities. The Complaint alleges nine counts and three classes of defendants: Warminster Township and Warrington Township ("Municipal Defendants"); the respective police chiefs of the Warminster and Warrington Townships, Michael Murphy and James Miller ("Defendant Chiefs"); and the officers who were at the scene, James McCaffery, Daniel Leporace, John Blanchard, Sean Harold, Christopher Springfield, Casey Byrne, Ron Szymborski, and Quentin Fuller ("Defendant Officers"). (*Id.* ¶ 7-18.) Within the group of Defendant Officers, the Complaint alleges that four officers fired at Sullivan: Officers Blanchard, McCaffrey, Harold, and Leporace. (*Id.* ¶ 33.) Counts I through III allege causes of action under 42 U.S.C. § 1983 against the Defendant Officers for use of excessive force, state-created danger, and denial of medical assistance, respectively. (*Id.* ¶¶ 38-71.) Count IV alleges a § 1983 municipal liability cause of action against the Municipal Defendants. (*Id.* ¶¶ 72-82.) Count V alleges a § 1983 supervisory liability cause of action against the Defendant Chiefs. (*Id.* ¶¶ 83-96.) And Counts VI through IX allege Pennsylvania state-law claims against the Defendant Chiefs and the Defendant Officers under the wrongful death and survival acts, for assault and battery, and for intentional infliction of emotion distress, respectively. (*Id.* ¶¶ 97-141.)

Defendants now move to dismiss the state-created-danger claim, the denial of medical assistance claim, the supervisory liability claim, and the state-law tort claims (Counts II, III and V through IX). Warminster Township and its employees (the "Warminster Defendants") have filed a motion to dismiss (Doc. No. 8), as have Warrington Township and its employees (the "Warrington Defendants"; Doc. No. 9). The motions substantially overlap. We treat them separately only where they raise distinct arguments. Neither group of Defendants challenges the

3

excessive force claim or the municipal liability claim (Counts I and IV). The Warminster Defendants move to strike paragraph 33 of the Complaint under Federal Rule of Civil Procedure 12(f). (*See* Doc. No. 8 at 5.) That paragraph states, in relevant part, that "[m]ost of the shots" fired by the Defendant Officers "missed their intended target, striking other objects and structures in the rear of the Sullivan home and her [sic] neighbors' homes. (Indeed, one of the shots struck and became lodged in the head board of a child who lived in an adjacent home.)" (Compl. ¶ 33.)

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides that a complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In *Iqbal*, the Supreme Court set forth a two-part analysis that district courts must conduct when reviewing a complaint challenged under Rule 12(b)(6). *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009) (describing *Iqbal*'s two-step inquiry). The district court must first separate "the factual and legal elements of a claim," accepting all of the complaint's well-pleaded facts as true but rejecting legal conclusions. *Id.* at 210 (citing *Iqbal*, 129 S. Ct. at 1949); *see also Iqbal*, 129 S. Ct. at 1949-50 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice [to state a claim]."). Under this analysis, well-pleaded factual allegations are to be given a presumption of veracity. *Iqbal*, 129 S. Ct. at 1950. The district court must then "determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 129 S.

4

Ct. at 1950). A complaint that merely alleges entitlement to relief, without alleging facts that show entitlement, must be dismissed. *Id.* By contrast, a complaint that demonstrates entitlement to relief through well-pleaded facts will survive a motion to dismiss. *See id.* Given the nature of the two-part analysis, "'[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *See McTernan v. City of York*, 577 F.3d 521, 530 (3d Cir. 2009) (quoting *Iqbal*, 129 S. Ct. at 1950).

## III. ANALYSIS

### A. § 1983 State-Created Danger

Defendants seek dismissal of Plaintiffs' state-created danger claim on the grounds that the Fourteenth Amendment state-created danger theory is unnecessarily duplicative of the Fourth Amendment excessive force theory. (*See* Doc. No. 8 at 4.) In response, Plaintiffs "do not dispute Defendants' contention that, to the extent Plaintiffs have a viable Fourth Amendment claim predicated on Defendants' conduct, it is unnecessary to state a separate Fourteenth Amendment claim." (Doc. No. 12 at 19 (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989).) Thus, Plaintiffs appear to concede Defendants' argument; indeed, the Supreme Court case they cite (but which Defendants do not) states that "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Graham*, 490 U.S. at 395. However, despite their apparent concession, Plaintiffs insist that "to the extent that Defendants' excessive and needless show of force created a danger, this conduct is within the 'totality of

5

circumstances' under which the fact-finder will evaluate Plaintiffs' Fourth Amendment claim." (Doc. No. 12 at 19.) What Plaintiffs attempt to achieve with this statement is unclear. However, since it is not an argument that they have stated a claim, we need not parse it. Since Plaintiffs do not argue that they have stated a cognizable state-created danger claim, we will grant Defendants' Motions with regard to Count II.

We note that there is no doubt as to the existence of a § 1983 state-created danger cause of action based on Fourteenth Amendment due process violations. *See, e.g., Bright v. Westmoreland County*, 443 F.3d 276, 281 (3d Cir. 2006). The Third Circuit, however, has deferred on deciding whether a plaintiff "may blend the state-created danger doctrine with the analysis governing Fourth Amendment excessive force claims." *Neuburger v. Thompson*, 124 F. App'x 703, 706 (3d Cir. 2005) (non-precedential); *Abraham v. Rasso*, 183 F.3d 279, 295-96 (3d Cir. 1999). *But see Estate of Smith v. Marasco (Smith I)*, 318 F.3d 497, 506, 513 (3d Cir. 2003) (permitting the decedent's estate to proceed with a state-created danger theory and an excessive force theory premised on the activation of a swat team, which allegedly resulted in the decedent's death). As the court in *Wheeler v. City of Philadelphia* observed, the Supreme Court's decision in *Graham* appears to preclude such an approach. *See* 367 F. Supp. 2d 737, 746 (E.D. Pa. 2005) (noting that the "major reason not to apply the state-created-danger doctrine" to pure excessive force claims "is that in *Graham* the Supreme Court wrote that '*all* claims that law enforcement officers have used excessive force . . . should be analyzed under the Fourth Amendment'" and that "[s]ubsequent Supreme Court cases show that *Graham's* italicized 'all' really means *all* in the inclusive dictionary sense" (quoting *Graham*, 490 U.S. at 390)). Although the *Wheeler* court's reasoning is persuasive, *see* 367 F. Supp. 2d at 746-47, we need not reach the issue

because Plaintiffs have not pursued it.

**B.  § 1983 Denial of Medical Assistance**

Count III of the Complaint alleges a § 1983 claim for denial of medical assistance arising

out of the Defendant Officers' failure to "immediately render any medical assistance" to Sean

Sullivan after he had been shot. (*See* Compl. ¶ 35.) Defendants challenge Plaintiffs' ability to

state a claim by relying on documentation that purportedly establishes that the Defendant

Officers attempted to provide Sean Sullivan with medical assistance immediately after the

shooting. (*See* Doc. No. 8 at 10-11.) Plaintiffs correctly point out that Defendants' reliance on

documents extrinsic to the Complaint is misplaced at this juncture. (*See* Doc. No. 12 at 7.)

"Generally, in ruling on a motion to dismiss, a district court relies on the complaint, attached

exhibits, and matters of public record." *Sands v. McCormick*, 502 F.3d 263, 268 (3d Cir. 2007)

(citation omitted). There is an exception to this rule, which permits "a court [to] consider an

undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if

the plaintiff's claims are based on the document." *Pension Benefit Guar. Corp. v. White Consol.*

*Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993). Defendants have not argued that the documents that

they rely on are the sort of undisputedly authentic documents that courts are permitted to consider

when deciding whether to dismiss a complaint for failure to state a claim. (*See* Doc. No. 8 at 11.)

Nor have Defendants requested that we convert their Motion to one for summary judgment. *See*

Fed. R. Civ. P. 12(d). We will therefore disregard the documents. Since Defendants have not

raised a proper motion-to-dismiss argument, their motions as to Count III will be denied.

Assuming, *arguendo*, that Defendants had actually challenged the sufficiency of the

allegations in Count III, that challenge would be unavailing. The Complaint states a claim for

denial of medical assistance in violation of the Fourteenth Amendment. To state a claim, a plaintiff must allege facts showing (1) a serious medical need and (2) acts or omissions by police officers that demonstrate a deliberate indifference to that need. *See Natale v. Camden County Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003). A plaintiff who has been shot by police officers and denied medical treatment can state a § 1983 claim for a violation of his Fourteenth Amendment rights. *Hogan v. City of Easton*, No. 04-0759, 2004 U.S. Dist. LEXIS 16189, at *30-33 (E.D. Pa. Aug. 15, 2004). In *Hogan*, the police came to the plaintiff's home and cornered him in his basement even though he had done nothing wrong. When the plaintiff emerged from his basement, they shot him several times, creating a serious medical need. *See id.* at *32-33. The plaintiff's allegations that the officers left him "'to die on the floor,' that they did not attend to his wounds, and that they did not have an ambulance immediately available, which caused a delay in getting [the plaintiff] the immediate medical attention he required," were sufficient to satisfy the deliberate indifference requirement. *See id.* at *33-34. Here, Plaintiffs allege that the officers shot Sean Sullivan for no reason and that they "did not immediately render any medical assistance to him." (*See* Compl. ¶¶ 33, 35.) Although Plaintiffs' allegations of deliberate indifference are not as detailed as those in *Hogan*, they are sufficient to state a claim.

### C.    § 1983 Supervisory Liability

Defendants contend that Plaintiffs can only state a claim against the Municipal Defendants and not the Defendant Chiefs. (Doc. No. 8 at 6-7.) Defendants argue that for Plaintiffs to "establish a separate claim for supervisory liability, plaintiffs must plead that [the Defendant Chiefs were] present on location, and in some way participated in a constitutional violation, or, in the alternative, that [they] ordered such an action in the first place." (*Id.* at 7.)

8

Plaintiffs correctly point out that this is an incorrect statement of the law. (*See* Doc. No. 12 at 8-9.) In *Sample v. Diecks*, the Third Circuit held that supervisory personnel could be liable under § 1983 for constitutional violations arising from the conduct of the employees they supervise. *See* 885 F.2d 1099, 1113-18 (3d Cir. 1989). This theory is not based on the doctrine of respondeat superior liability, but rather on supervisory practices or procedures that result in constitutional violations. *Brown v. Muhlenberg Township*, 269 F.3d 205, 216 (3d Cir. 2001). In order to state a § 1983 supervisory liability claim for violation of a constitutional right, a plaintiff must,

> (1) identify the specific supervisory practice or procedure that the supervisor failed to employ, and show that (2) the existing custom and practice without the identified, absent custom or procedure created an unreasonable risk of the ultimate injury, (3) the supervisor was aware that this unreasonable risk existed, (4) the supervisor was indifferent to the risk; and (5) the underling's violation resulted from the supervisor's failure to employ that supervisory practice or procedure.

*Id.* at 216. A plaintiff cannot state a claim merely by asserting that the supervisor could hypothetically have prevented the cognizable constitutional injury. *Id.* (quoting *Sample*, 885 F.2d at 1118). Rather, "the plaintiff must identify specific acts or omissions of the supervisor that evidence deliberate indifference and persuade the court that there is a relationship between the identified deficiency and the ultimate injury." *Id.* (quotation marks and citation omitted).

The Complaint alleges that the Defendant Chiefs failed to properly train the officers to make arrests, including how to use force in furtherance of making an arrest. (*See* Compl. ¶¶ 83-87.) This failure to train created an unreasonable risk that the officers would use excessive force or improperly use deadly force, which they allegedly did when they fired fifty-six shots at Sean Sullivan, mortally wounding him. (*See id.* ¶ 96.) Moreover, the Complaint alleges that the

9

Defendant Chiefs knew of the unreasonable risk and were indifferent to it. (*See id.* ¶¶ 89-90.) As the Supreme Court has observed, "[t]he need to train officers in the constitutional limitations on the use of deadly force may be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." *City of Canton v. Harris*, 489 U.S. 378, 390 n.10 (1989) (internal citation omitted) (municipal liability); *Sample*, 885 F.2d at 1117 (supervisory liability); *see also Lieberman v. Marino*, No. 06-2745, 2007 U.S. Dist. LEXIS 17735, at *20-21 & n. 6 (E.D. Pa. Mar. 14, 2007) (holding that police chiefs who were not present at an arrest that resulted in the death of the plaintiffs' decedent could be liable on a § 1983 supervisory liability theory where the arresting officers used deadly force). Finally, the Complaint alleges that Sean Sullivan's death was caused by the Defendant Chiefs' failure to train. (*See* Compl. ¶ 92.) Accordingly, the Complaint states a § 1983 supervisory liability claim against the Defendant Chiefs, and Defendants' motions will be denied with regard to Count V.

### D.    Wrongful Death and Survival Act Claims, and Assault and Battery

Defendants move to dismiss the wrongful death and survival act claims, and the assault and battery claim on several grounds. The Warminster Defendants argue that these claims against Chief Murphy are, in essence, claims against the municipality itself and should be dismissed. (Doc. No. 8 at 7-9.) They also argue that all claims brought against Defendants in their official capacities should be dismissed. (*Id.* at 8.) This second argument can be disregarded since the Complaint does not state claims against any police officer Defendant in his official capacity. (*See* Compl. ¶¶ 9-18; *see also* Doc. No. 12 at 12 n.8.) The Warrington Defendants argue that the claims should be dismissed under the Pennsylvania Political Subdivision Tort Claims Act ("Tort Claims Act"), 42 Cons. Stat. § 8541 *et seq.* (Doc. No. 9 at 8-9.) Plaintiffs

respond that since they are suing the police officer Defendants in their individual capacities for willful misconduct, the Tort Claims Act does not apply. Their brief does not address the Warminster Defendants' argument that the claims against Chief Murphy are claims against the municipality and should be dismissed.

Wrongful death and survival act claims are not substantive causes of action; rather, they provide a means of recovery for unlawful conduct that results in death. *See* 42 Pa. Cons. Stat. §§ 8301(a), 8302; *Carroll v. Skloff*, 202 A.2d 9, 10 (Pa. 1964) ("The cause of action created by the survival statute is strictly derivative."), *overruled on other grounds by Amadio v. Levin*, 501 A.2d 1085, 1089 (Pa. 1985); *Sunderland v. R.A. Barlow Homebuilders*, 791 A.2d 384, 391 (Pa. Super. 2002) (observing that a wrongful death "cause of action is derivative of the underlying tortious acts that caused the fatal injury"), *aff'd*, 838 A.2d 662 (2003); *Morais v. City of Philadelphia*, No. 06-582, 2007 U.S. Dist. LEXIS 19619, at *43 n.17 (E.D. Pa. Mar. 20, 2007). A claim under the wrongful death act permits certain family members to "recover damages for the death of an individual caused by the wrongful act or neglect or unlawful violence or negligence of another . . . ." 42 Pa. Cons. Stat. § 8301(a); *Sunderland*, 791 A.2d at 391. A claim under the survival act permits a decedent's estate to bring a claim on the decedent's behalf. *Id.* § 8302; *Tulewicz v. SEPTA*, 606 A.2d 427, 431 (Pa. 1992). It "is not a new cause of action but one which 'merely continues in the decedent's personal representatives the right of action which accrued to the deceased at common law because of the tort.'" *Tulewicz*, 606 A.2d at 431 (quoting *Pezzulli v. D'Ambrosia*, 26 A.2d 659, 661 (Pa. 1942)) (alterations omitted). Thus, both actions are premised on underlying unlawful conduct—in this case, the conduct of the Defendant Officers that resulted in Sean Sullivan's death.

11

When municipal employees, such as police officers, engage in allegedly unlawful acts that are within the scope of their employment, the Tort Claims Act provides immunity "for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person." 42 Pa. Cons. Stat. §§ 8541, 8545. The Act contains eight enumerated exceptions, none of which apply to this case. *See id.* § 8542. It also does not extend immunity to a government employee when "the act of the employee caused [an] injury and that . . . act constituted a crime, actual fraud, actual malice or willful misconduct." *Id.* § 8550. Where a municipal employee who commits a crime or fraud or engages in actual malice or willful misconduct, the Tort Claims Act does not provide immunity, even when an employee is acting within the scope of his employment. *See Sanford v. Stiles*, 456 F.3d 298, 315 (3d Cir. 2006); *see also Bright*, 443 F.3d at 287. Pennsylvania courts and the Third Circuit recognize that "willful misconduct" is a "demanding level of fault." *Sanford*, 456 F.3d at 315 (quoting *Renk v. City of Pittsburgh*, 641 A.2d 289, 293 (Pa. 1994)); *Brown v. Muhlenberg Township*, 269 F.3d 205, 214 (3d Cir. 2001) (citing *Delate v. Kolle*, 667 A.2d 1218, 1221 (Pa. Commw. Ct. 1995); *Kuzel v. Krause*, 658 A.2d 856, 859 (Pa. Commw. Ct. 1995)). It means "that the actor desired to bring about the result that followed or at least that he was aware that it was substantially certain to ensue." *Keenan v. City of Philadelphia*, 936 A.2d 566, 569 n.9 (Pa. Commw. Ct. 2007) (citing *Evans v. Phila. Transp. Co.*, 418 Pa. 567, 212 A.2d 440 (1965)).

Where police conduct is at issue, "willful misconduct" takes on an narrower meaning. *See Renk v. City of Pittsburgh*, 641 A.2d 289, 293-94 (Pa. 1994). It means that the an officer acted with the knowledge that his conduct was unlawful and with the purpose of achieving an unlawful result. *See Owens v. City of Philadelphia*, 6 F. Supp. 2d 373, 394 (E.D. Pa. 1998)

12

("The *Renk* decision construed 'willful misconduct' to mean 'misconduct which the perpetrator recognized as misconduct and which was carried out with the intention of achieving exactly that wrongful purpose.'" (quoting *In re City of Phila. Litig.*, 938 F. Supp. 1264, 1273 (E.D. Pa. 1996))). Because a "police officer may use such force as is necessary under the circumstances to effectuate" an arrest, in the context of allegations of assault and battery the "reasonableness of the force used in making the arrest determines whether the police officer's conduct constitutes an assault and battery." *Renk*, 641 A.2d at 293; *see also Sharrar v. Felsing*, 128 F.3d 810, 821-22 (3d Cir. 1997) (listing factors to be used when determining whether police officers' use of force is "objectively reasonable" in the context of Fourth Amendment claims).

The Complaint contains varying levels of detail about the various Defendants' involvement in the events leading to Sean Sullivan's death. It is clear from the allegations in the Complaint that the conduct of the Defendant Officers who fired on Sean Sullivan rises to the level of willful misconduct. The Defendant Officers' use of force was unreasonable. They shot Sean Sullivan in the back as he ran away. (*See* Compl. ¶¶ 33-34.) There are no facts alleged in the Complaint that would justify the use of deadly force. Accordingly, to the extent that Defendants' motions seek to dismiss the wrongful death and survival act claims, and the assault and battery claim against the Defendant Officers who fired on Sean Sullivan, the motions will be denied.

It is less clear whether the actions of the Defendant Officers who did not fire on Sean Sullivan rise to the level of willful misconduct required to surmount the protections of the Tort Claims Act. Plaintiffs certainly have not stated an assault or battery claim against these officers, but they have stated a denial of medical assistance claim. That claim, however, is based largely

13

on the allegation that the officers "did not immediately render any medical assistance to" Sean Sullivan after he had been shot. (*See* Compl. ¶ 35.) There are no facts alleged from which the specific intent to deprive Sean Sullivan of medical assistance could be inferred and attributed to all the Defendant Officers. Although the Complaint states that the "actions of Defendants as described . . . were willful, wanton, reckless, callously indifferent, and in conscious disregard for the safety of others" (*id.* ¶ 70), this is the type of vague and conclusory language that should be disregarded when considering a motion to dismiss, *see Iqbal*, 129 S. Ct. at 1949.

A denial of medical assistance claim requires a plaintiff to allege facts showing deliberate indifference. *See Natale*, 318 F.3d at 582. We have determined that the Complaint alleges sufficient facts to show deliberate indifference here, in part because Defendants have not articulated a proper motion-to-dismiss challenge and in part because deliberate indifference can be inferred, at least at the motion-to-dismiss stage, where some police officers unnecessarily shoot a suspect and other officers who did not participate in the shooting do not obtain medical assistance for the person who was shot. *See Hogan*, 2004 U.S. Dist. LEXIS 16189, at *30-33. Allegations of such conduct on the part of the non-firing officers cannot, without more detail, be used to infer that the officers specifically intended to cause "injury to a person." *See* 42 Pa. Cons. Stat. §§ 8541, 8550; *see also Bright*, 443 F.3d at 287 (noting that plaintiffs seeking to invoke § 8550 must establish that a municipal employee acted with specific intent); *Vicky M. v. Ne. Educ. Intermediate Unit*, No. 06-1898, 2009 U.S. Dist. LEXIS 85026, at *41 (M.D. Pa. Sept. 16, 2009) (observing that in order to overcome the Tort Claims Act, "'[a] plaintiff must establish that the actor desired to bring about the result that followed, or at least it was substantially certain to follow, i.e., specific intent'" (quoting *Robbins v. Cumberland County Children & Youth*

14

*Servs.*, 802 A.2d 1239, 1252-53 (Pa. Commw. Ct. 2002))); *cf. Pierre v. Attorney Gen. of the United States*, 528 F.3d 180, 190 (3d Cir. 2008) (holding that deliberate indifference could not satisfy the specific intent requirement of the Convention Against Torture because "[s]pecific intent requires not simply the general intent to accomplish an act with no particular end in mind, but the additional deliberate and conscious purpose of accomplishing a specific and prohibited result," and "[m]ere knowledge that a result is substantially certain to follow from one's actions is not sufficient . . . ."). In fact, the actions of many of the Defendant Officers who did not fire on Sean Sullivan are described in so little detail in the Complaint that their involvement in any willful misconduct is impossible to discern. For example, the Complaint alleges that Officers Springfield, Harold, and Szymborski took up position in front of the Sullivans' home. It does not indicate that they moved to the rear of the home, where the allegedly wrongful conduct took place. (*See* Compl. ¶¶ 25, 32-37.) The Complaint goes on to allege that Officer Harold fired shots at Sean Sullivan (*id.* ¶ 33), but it is silent regarding the involvement of Officers Springfield and Szymborski. Because the Complaint does not allege facts from which a specific intent to deny Sean Sullivan medical assistance can be inferred, the wrongful death and survivor act claims against the Defendant Officers who did not fire on Sean Sullivan will be dismissed. *Cf. Smith v. Marasco (Smith II)*, 430 F.3d 140, 151 (3d Cir. 2005) (observing that "to prevail on a § 1983 claim against multiple defendants, a plaintiff must show that each individual defendant violated [the plaintiff's] constitutional rights" and holding that, where the defendant-officers' knowledge of the plaintiff's condition was probative of liability, the plaintiff bore the burden of establishing each particular officer's knowledge).

With regard to the Defendant Chiefs, the allegations of the Complaint amount to little

more than threadbare assertions of willful misconduct. No facts are alleged that show that either of the Defendant Chiefs engaged in willful misconduct, acted in concert with the Defendant Officers who fired on Sean Sullivan, or in any way intentionally facilitated the conduct of those officers. For these reasons, the wrongful death and survival act claims, and the assault and battery claims against the Defendant Chiefs will be dismissed.

### E.   Intentional Infliction of Emotional Distress

Defendants seek dismissal of Plaintiffs' intentional infliction of emotional distress ("IIED") claim because "Plaintiffs have failed to allege that the actions of the individual Defendants[] resulted in severe emotional distress requiring a doctor's treatment" or that Plaintiff suffered a physical injury as a result of Defendants' conduct. (Doc. No. 8 at 9-10.) In addition, the Warminster Defendants specifically seek dismissal of the claim against Chief Murphy on the same grounds that they sought dismissal of the assault and battery claim against him. (*Id.* at 9.) Plaintiffs respond that they do not need to allege physical injury to state an IIED claim in Pennsylvania and that although they will ultimately need to substantiate their claim with medical testimony, they do not need to do so to survive a motion to dismiss. (Doc. No. 12 at 16-18.)

The Supreme Court of Pennsylvania has addressed IIED claims on several occasions, but it has never adopted the tort as law in Pennsylvania. *See, e.g.*, *Taylor v. Albert Enstein Med. Ctr.*, 754 A.2d 650, 652 (Pa. 2000) (collecting cases). The Third Circuit, however, has predicted that the Supreme Court of Pennsylvania would adopt the IIED tort set forth in section 46 of the Restatement (Second) Torts. *Williams v. Guzzardi*, 875 F.2d 46, 50-51 (3d Cir. 1989) (discussing *Chuy v. Phila. Eagles Football Club*, 595 F.2d 1265, 1273 (3d Cir. 1979) (en banc)). Section 46 provides that,

16

(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

(2) Where such conduct is directed at a third person, the actor is subject to liability if he intentionally or recklessly causes severe emotional distress

> (a) to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm, or

> (b) to any other person who is present at the time, if such distress results in bodily harm.

Restatement (Second) Torts § 46 (1965). We are bound by the Third Circuit's prediction, and will apply section 46 here.

The Complaint alleges that Carol Sullivan witnessed the police shoot her son to death. (Compl. ¶ 37.) It further alleges that as "a direct and proximate result of being in such close proximity to the violent death of her son, [Carol] Sullivan has suffered from post traumatic stress disorder, depression, anxiety, vomiting, and insomnia." (*Id.* ¶ 134.) Viewing these specific allegations in conjunction with the allegations of an absence of provocation by Sean Sullivan, the allegations regarding the magnitude of the firing Defendant Officers' response—shooting at him fifty-six times—and the allegations of refusal of timely medical assistance, Plaintiffs have stated an IIED claim against the Defendant Officers who fired on Sean Sullivan.

Defendants' arguments that Plaintiffs' IIED claim fails because the Complaint does not allege that Carol Sullivan required medical treatment as a result of her emotional distress and because she did not experience any physical injury are unavailing. (Doc. No. 8 at 9-10.) As the Supreme Court of Pennsylvania has recognized, "[i]t is basic to tort law that an injury is an element to be proven." *Kazatsky v. King David Mem'l Park, Inc.*, 527 A.2d 988, 995 (Pa. 1987).

17

In the context of section 46, this means that "at the very least, existence of the emotional distress must be supported by competent medical evidence." *Id.* The Complaint alleges that Carol Sullivan has experienced posttraumatic stress disorder, depression, anxiety, vomiting, and insomnia. (*See* Compl. ¶ 134.) Eventually, Plaintiffs will need to substantiate these allegations with competent medical evidence, either at trial or at summary judgment if Defendants so move. *See Kazatsky*, 527 A.2d at 995; *Silver v. Mendel*, 894 F.2d 598, 607 n.19 (3d Cir. 1990). Plaintiffs need not do so at the pleading stage. Nor do Plaintiffs need to allege that Carol Sullivan experienced physical injury. The express language of section 46 permits parties who witness outrageous conduct directed at close family members to bring claims "whether or not such distress results in bodily harm." Restatement (Second) Torts § 46(2)(a) (1965). Defendants' Motions to dismiss the IIED claims against the Defendant Officers who fired on Sean Sullivan will be denied.

Defendants' argument with regard to the Defendant Chiefs fairs better. As with the wrongful death and survival act claims, and the assault and battery claim, the Complaint contains no allegations on which liability of the Defendant Chiefs could be premised. Indeed, Plaintiffs go out of their way to make clear that the Defendant Chiefs are being sued in their individual capacities. (*See* Doc. No. 12 at 12 n.8; Compl. ¶¶ 9-10.) In addition, as with the assault and battery claim, the Complaint is devoid of any allegations that could form the basis for an IIED claim against the Defendant Officers who did not fire on Sean Sullivan. There are no allegations, for instance, that suggest that the conduct of these officers was outrageous. Merely being present when another commits an outrageous act is not sufficient to impute outrageousness. *See* Restatement (Second) Torts § 46 cmts. a-d (1965). Accordingly, the Defendants' Motions will

18

be granted with regard to the Defendant Chiefs and the Defendant Officers who did not fire on Sean Sullivan.

### H.    Motion to Strike

The Warminster Defendants move to strike paragraph 33 of the Complaint under Federal Rule of Civil Procedure 12(f). (*See* Doc. No. 8 at 5.) Paragraph 33 states that many of the shots fired by the Defendant Officers "missed their intended target, striking other objects and structures in the rear of the Sullivan home and her [sic] neighbors' homes. (Indeed, one of the shots struck and became lodged in the head board of a child who lived in an adjacent home.)" (Compl. ¶ 33.)

Rule 12(f) gives district courts discretion to strike "from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter." Motions to strike are disfavored. *McInerney v. Moyer Lumber & Hardware, Inc.*, 244 F. Supp. 2d 393, 402 (E.D. Pa. 2002). The standard is "strict," and "only allegations that are so unrelated to plaintiffs' claims as to be unworthy of any consideration should be stricken." *Johnson v. Anhorn*, 334 F. Supp. 2d 802, 809 (E.D. Pa. 2004) (citation and quotations marks omitted). To be immaterial, an allegation must have "no essential or important relationship to the claim for relief." *Del. Health Care, Inc. v. MCD Holding Co.*, 893 F. Supp. 1279, 1291-92 (D. Del. 1995) (citation omitted). To be impertinent, an allegation must consist "of statements that do not pertain, and are not necessary, to the issues in question." *Id.* And to be scandalous, an allegation must "improperly cast[] a derogatory light on someone, most typically on a party to the action." 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1382 (3d ed.). It "must reflect cruelly upon the defendant's moral character, use repulsive language or detract from the dignity of the court." *Carone v. Whalen*, 121 F.R.D. 231, 233 (M.D. Pa. 1988) (citations and quotation marks omitted).

19

The Warminster Defendants assert that the language in paragraph 33 regarding the stray bullet hitting a child's headboard is an attempt to "elicit sympathy" and is "meant merely to provide heat, not light." (*See* Doc. No. 8 at 5.) Regardless of whether the comment is an attempt to elicit sympathy, Defendants are correct that the statement is inappropriate and clearly intended to cast Defendants in a negative or prejudicial light. *See Hanover Ins. Co. v. Ryan*, 619 F. Supp. 2d 127, 133 (E.D. Pa. 2007) ("[C]ourts have identified prejudice to one or more of the parties as a touchstone for deciding a motion to strike." (citing *Miller v. Group Voyagers, Inc.*, 912 F. Supp. 164, 168 (E.D. Pa. 1996))). Moreover, Plaintiffs' own drafting decisions demonstrate that the sentence is not necessary to the issue in question. By making the observation in a parenthetical comment, Plaintiffs indicate that the thought is an aside or is incidental. *See, e.g.*, Bryan A. Garner, The Elements of Legal Style § 2.9 (2d ed. 2003) (noting that parenthetical comments are used to "interpolat[e] incidental thoughts—a mannerism to keep in check"). Considering the observation's obvious prejudice to Defendants and its apparent incidental or impertinent nature, granting Defendants' motion is appropriate.

Plaintiffs' motive in including the observation is also suspect since it is unlikely that such inflammatory language—i.e., noting that a stray bullet lodged in the headboard of a *child*—would survive a motion under Federal Rule of Evidence 403. We are aware that making evidentiary rulings at the pleading stage is disfavored. *See, e.g.*, *U.S. Football League v. NFL*, 634 F. Supp. 1155, 1166 (S.D.N.Y. 1986) ("[O]rdinarily a court should not 'decide to strike a portion of the complaint—on the grounds that the material could not possibly be relevant—on the sterile field of the pleadings alone.'" (quoting *Lipsky v. Commw. United Corp.*, 551 F.2d 887 (2d Cir. 1976))). Nevertheless, we are satisfied that including inflammatory information that has

20

little, if any, chance of surviving a motion *in limine* can serve as a factor in deciding a Rule 12(f) challenge.

**IV.    CONCLUSION**

For the reasons stated above, Defendants' Motions will be granted in part and denied in part.

An appropriate Order follows.

BY THE COURT:

R. Barclay Surrick, Judge

ENTERED

CLERK OF COURT