IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


CAROL A. SULLIVAN and          :
BRUCE SULLIVAN, *individually and*  :
*as co-administrators of the estate of*  :
*Sean Sullivan*,                :
                         :        CIVIL ACTION
      v.               :
                         :        NO. 07-4447
WARMINSTER TOWNSHIP, ET AL.  :


**SURRICK, J.**                                          **MARCH 15, 2011**

<u>**MEMORANDUM**</u>

Presently before the Court are Defendants Warminster Township, Chief Michael Murphy, James McCaffrey, Daniel Leporace, Christopher Springfield, Sean Harold, Ron Szymborski and Casey Byrne's Partial Motion for Summary Judgment (ECF No. 49), and the Motion for Summary Judgment of Defendants, Warrington Township, Chief James Miller, Officer Quentin Fuller, and Officer John Blanchard (ECF No. 50).  For the following reasons, Defendants' Motions will be granted in part and denied in part.

I.      **BACKGROUND**

On March 31, 2006, 21-year-old Sean Sullivan was shot by police officers from the Warminster Township Police Department and the Warrington Township Police Department after he climbed out of a window in his mother's home attempting to escape arrest.  (Pls.' Resp. 1-2, ECF No. 53.)  Sean Sullivan died as a result of the gunshot wounds.  (*Id.*)  Sean's parents, Plaintiffs Carol and Bruce Sullivan, filed this lawsuit on October 24, 2007, alleging constitutional violations by the officers and the municipalities as well as violations of

Pennsylvania state law.[1]  (Compl., ECF No. 1.)  The record in this case establishes the following

facts and circumstances surrounding the incident that gave rise to this lawsuit.

On March 13, 2006, a delivery person for a Chinese restaurant was robbed at gunpoint by

four people.  (Defs.' Mot. Ex. C at 1, ECF No. 49.)  The Affidavit of Probable Cause for the

arrest warrant alleges that Sean Sullivan participated in the robbery and was known to carry a

black handgun with him at all times.  (*Id.* at 2.)  The Affidavit further alleges that Sean and two

others were arrested by the Abington Police Department on March 15, 2006, for fraudulently

using credit cards that were stolen in the March 13 robbery.  (*Id.*)  During the arrest, Sean

identified himself to the police officers as Corey Sullivan, which is the name of his younger

brother.  (Warminster Defs.' Mot. Ex. J. at 8.)  After receiving a call from Sean, Carol Sullivan

went to the police station ostensibly to bail out her son Corey.  (Sullivan Dep. 104:18-105:18,

Pls.' Resp. Ex. A.)  After Carol paid the bail and signed the appropriate papers, Sean was

released and met his mother at her car.  (*Id.* at 111:10-112:24.)  When Carol realized that it was

Sean who had been arrested and not Corey, she exclaimed "Oh, my God" repeatedly, and the two

---

[1] Plaintiffs maintain the following causes of action:
- Count I:  § 1983 excessive force against Blanchard, McCaffrey, Harold, Leporace, Springfield, Byrne, and Szymborski.
- Count III:  § 1983 denial of medical assistance against Blanchard, McCaffrey, Harold, Leporace, Springfield, Byrne, Szymborski, and Fuller.
- Count IV:  § 1983 municipal liability against Warminster Township.
- Count V:  § 1983 supervisory liability against Murphy.
- Count VI:  Wrongful death against Blanchard, McCaffrey, Harold, and Leporace.
- Count VII:  Survival action against Blanchard, McCaffrey, Harold, and Leporace.
- Count VIII:  Assault and battery against Blanchard, McCaffrey, Harold, and Leporace.
- Count IX:  Intentional infliction of emotional distress against Blanchard, McCaffrey, Harold, and Leporace.

of them drove away.  (*Id.* at 112:21-113:7.)  Carol admonished Sean that she was going to tell the court that it was Sean rather than Corey who had been arrested for using the stolen credit cards. She told him, "You have to go back and do the right thing.  You can't get your brother in trouble."  (*Id.* at 113:21-24.)

This incident was not Sean's first encounter with the criminal-justice system.  He had previously been incarcerated on at least four different occasions.  He was incarcerated in the Montgomery County prison three times and in the Bucks County prison once.  (Sullivan Dep. 37:24-38:9.)  Sean had also spent time in the Edison juvenile facility, and he was on probation at the time of this incident.[2]  (*Id.* 38:10-15.)

On March 24, 2006, a warrant was issued for Sean's arrest.[3]  (Pls.' Resp. Ex. C at 1-4.) The warrant charged Sean with criminal attempt, forgery, access device fraud, theft by unlawful taking, theft by deception, receiving stolen property, possession of controlled substance, tampering with records or identification, false swearing, unsworn falsification, false identification to law enforcement, and obstructing administration of law.  (*Id.* at 11-12.)  At the same time an arrest warrant was issued for Carol Sullivan charging her with tampering with public records or information, unsworn falsification to authorities, and obstructing administration

---

[2]  Plaintiffs have filed a Motion in Limine to Exclude Evidence of Sean Sullivan's Criminal History.  (ECF No. 63.)  We will address this Motion at trial.

[3]   The record establishes that at the time of this incident Sean had been diagnosed with oppositional defiant disorder, attention deficit hyperactivity disorder, and major depression. (Sullivan Dep. 210:12-21.)

of law.  (*Id.* at 7.)  These charges were the result of Carol bailing out her son Corey, who in fact turned out to be Sean.[4]

For the two weeks following Sean's release on bail, he stayed with friends.  (*Id.* at 201:7-13.)  He returned to the Sullivan home on March 30, 2006.  (*Id.* at 117:17-19.)  Sean told Carol that he had called his probation officer and was going to turn himself in at noon the following day.  (*Id.* at 117:22-118:3.)  He spent the night at the Sullivan house.  (*Id.* at 117:17-118:16.)

At 6:23 am the next morning, Lieutenant Christopher Springfield, Corporal Casey Byrne, and Officers Sean Harold, Ron Szymborski, Jim McCaffrey and Dan Leporace of Warminster Township arrived at the Sullivan home to serve an arrest warrant on Carol Sullivan.  (Warminster Defs.' Mot. Ex. B at 1.)  The primary purpose of taking Carol into custody was to enlist her help in finding Sean.  (Murphy Dep. 27:7-23, Pls.' Resp. Ex. G.)  The police were not aware that Sean was at his mother's house when they arrived to serve the warrant on Carol.  (Springfield Dep. 29:24-30:10, Pls.' Resp. Ex. F.)  Warminster Police Chief Michael Murphy testified that he did not think it was necessary to put together either a written or "hasty" arrest plan for Carol, as is typically done when the Warminster police department is preparing to serve an arrest warrant on a suspect.  (Murphy Dep. 39:6-9, 44:17-23.)  Five of the six officers who went to serve the warrant on Carol were in plainclothes, with only Officer Byrne in uniform.  (*Id.* at 110:7-10.)

McCaffrey and Leporace took up positions in the rear of the houses immediately adjacent to the Sullivan residence.  (McCaffrey Dep. 23:5-10, Pls.' Resp. Ex. K; Leporace Dep. 13:6-15, Pls.' Resp. Ex. L.)  Byrne took up a position at the front corner of the Sullivan property, while

---

[4] Evidently, this incident was not Carol Sullivan's first encounter with law enforcement. (*See* Report of Timothy J. Michals, M.D. 11-12, Warminster Defs.' Mot. Ex. X (noting that Carol was charged with possession of marijuana in 2005 and DUI in 1988).)

Springfield, Harold, and Szymborski approached the front door. (Byrne Dep. 25:1-26:9, Pls.' Resp. Ex. O.) Harold knocked hard on the front door. (Harold Dep. 70:23-71:6, Pls.' Resp. Ex. N.) When Carol looked out the window in her door, she saw three officers pointing their guns at her door. (Sullivan Dep. 121:12-19.) She testified that when she opened the door, the officers entered, with Springfield saying "Shut the fuck up, you stupid bitch." (*Id.* at 123:6-9, 125:4-10.) Springfield knocked Carol on the floor, picked her up, threw her on the couch, and asked, "Who the fuck's in this house?" (*Id.* at 127:5-24.) Carol indicated that Sean was in the bedroom. (*Id.* at 128:8-17.) An officer handcuffed Carol, and she was moved to the kitchen floor. (*Id.* at 134:17-136:7.)

Upon hearing the scuffle, Sean said through his bedroom door, "Leave my mom alone. She didn't do anything." (*Id.* at 136:10-14.) Carol testified that an officer responded by saying, "Oh, what? You have a gun?" (*Id.* at 137:2-4.) Carol exclaimed, "That's not what he said." (*Id.*) The police dispatch report indicates at 6:27 am: "SUBJ[ECT] BARACADED [sic] IN BEDROOM WITH GUN."[5] (Warminster Defs.' Mot. Ex. B at 1.) Springfield declared a barricade (Springfield Dep. 64:3-9), and Carol was removed in handcuffs to a waiting police car some distance from the house. (Sullivan Dep. 138:13-18.) Harold took up a position at the right rear corner of the Sullivan property. (Harold Dep. 46:21-47:3.) McCaffrey and Leporace were already positioned in the backyards of the properties that are adjacent to the Sullivan property.

---

[5] Officer Harold testified that Sean repeatedly stated, "I have a gun," from behind his closed bedroom door. (Harold Dep. 76:20-77:5) Officer Springfield did not hear Sean reference a gun; rather, he was informed of the gun by another officer. (Springfield Dep. 63:21-64:2.) As we are required to view the facts in the light most favorable to Plaintiffs for purposes of this summary-judgment motion, *Kelly v. Borough of Carlisle*, 622 F.3d 248, 253 (3d Cir. 2010), we will assume that the police suggested that Sean had a gun—a suggestion that subsequently appeared on the police dispatch report.

(McCaffrey Dep. 23:5-10; Leporace Dep. 13:6-15.)  Springfield created a "hasty command post" in a police cruiser, which he pulled around the corner of Locust and Chestnut Streets, out of Sean's sight.  (Springfield Dep. 65:2-70:21.)  Byrne and Szymborski took up positions at the front corners of the Sullivan property.  (Szymborski Dep. 46:6-11, Pls.' Resp. Ex. H; Byrne Dep. 32:18-24.)

Once the police had taken their positions around the Sullivan residence, all three officers in the backyard communicated with Sean.  Harold testified that he had instructed Sean to come out, although it was Sean who initiated the communication.  (Harold Dep. 47:9-16.)  Leporace saw Sean stick his head out the window and told him to come out with his hands up.  (Leporace Dep. 17:22-18:15.)  McCaffrey ordered Sean to come out the front door.  (McCaffrey Dep. 34:2-35:2.)  David Cook, a neighbor, described the officers as being "at a very elevated level of excitement.  They were very agitated in their movements.  One of them in particular was very antsy, very agitated, was obviously very eager to have a conversation with whoever it was." (Cook Dep. 14:9-17, Pls.' Resp. Ex. R.)  Another neighbor, Robert Franks, testified that the officers were encouraging Sean to come out, and Sean replied, "if I come out, you're going to shoot me."  (R. Franks Dep. 114:18-23, Pls.' Resp. Ex. M; *see also* K. Franks Dep. 24:5-11, Pls.' Resp. Ex. T.)  The police dispatch report indicates that the officers were talking to Sean and "trying to get him to come out," and Sean was "egging [the officers] on" and "saying he wants to hurt police."  (Warminster Defs.' Mot. Ex. B at 1-2.)  Neighbor Kelly Franks testified that she did not hear Sean say anything other than that he feared he would be shot if he came out.  (K. Franks Dep. 26:4-9.)

Warrington Police Officers Blanchard and Fuller arrived on the scene at approximately

6:32 am.  (Warminster Defs.' Mot. Ex. B at 1.)  Both Blanchard and Fuller are members of the

Bucks County Central Emergency Response Team, a unit that is trained to deal with emergency

situations such as the one unfolding at the Sullivan residence.  (Blanchard Dep. 102:2-21, Pls.'

Resp. Ex. U.)  Blanchard ran along the back fence of the Sullivan property and took up a position

next to McCaffrey behind a shed in a neighbor's backyard.  (R. Franks Dep. 101:4-16; Blanchard

Dep. 16:18-17:14.)  Blanchard was armed with a CPM4 223-caliber rifle.  (Blanchard Dep.

101:15-21.)

The police dispatch report indicates that shots were fired at 6:46 am.  (Warminster Defs.'

Mot. Ex. B at 2.)  Blanchard testified that when Sean climbed out of the window and hit the

ground, he started pulling the base of his shirt up and to the side at his waist.  (Blanchard Dep.

24:13-26:5; Leporace Dep. 32:16-23.)  Blanchard heard someone yell, "Gun!" and then heard

gunshots.  (*Id.* at 25:20-26:18.)  Leporace testified that he opened fire when he saw Sean pull a

gun from his waistband.  (Leporace Dep. 35:11-21.)  Harold testified that after exiting the

window, Sean drew a gun and "squared up" on him.  (Harold Dep. 22:3-8.)  Harold started firing

at Sean, who began running across the backyard.  (*Id.*)  Harold believed that he hit Sean with his

first shot.  (*Id.* at 33:1-10.)  Sean ran about halfway through the backyard before falling.  (*Id.* at

34:12-18; Leporace Dep. 56:3-22.)  Leporace was unsure whether Sean fell because he had been

shot or because he had tripped.  (Leporace Dep. 56:19-22.)  Sean immediately got up and once

again aimed his weapon at Leporace and Harold, according to Leporace's testimony.  (*Id.* at

57:10-58:4.)  He resumed running toward the back fence of the Sullivan property.  (Harold Dep.

41:8-17; McCaffrey Dep. 19-20.)  When Sean got to the fence, Blanchard fired two shots from

his rifle.  (Blanchard Dep. 31:23-32:5.)  Sean fell over the fence and came to rest on his back on

the other side of the fence. (*Id.*) The officers fired a total of 55 shots at Sean, six of which hit him. (Murphy Dep. Ex. 4.) Three of the bullets struck Sean in the back.[6] (Coroner's Report 3, Pls.' Resp. Ex. W.)

Robert Franks testified that he saw Sean come out of the window with both his hands on the sill and his right foot still stuck in the window. (R. Franks Dep. 128:17-129:4.) Sean dropped out of Mr. Frankses' view when he dropped from the window. (*Id.* at 131:7-17.) Mrs. Franks testified that while she did not see Sean drop out of the window, she did see him land on the ground in a crouch. She did not see Sean's hands when he landed. (K. Franks Dep. 28:21-30:11.) Mr. Franks testified that Leporace and Harold jumped out from their cover behind a tree and opened fire after Sean dropped from the window. (R. Franks Dep. 92:22-93:3.) Sean started running, at which point Mrs. Franks ran to another window, causing her to lose sight of him. (*Id.* at 100:6-9, 30:17-21, 101:2-9.) When she got to the back window of her house, Sean was coming out from behind a shed that partially obscured the Frankses' view of the Sullivans' backyard. (*Id.* at 31:15-20.) His arms were flailing above his head, and Mrs. Franks did not see a gun in his hands. (K. Franks 103:20-22.) Nor did Mrs. Franks see a gun on or near Sean when he went down after climbing the fence. (*Id.* at 105:12-14.) Mr. Franks saw Sean in the window for approximately three to five seconds before he fell out of Mr. Frankses' sight. (R. Franks Dep. 119:20-120:3.) He was out of Mr. Frankses' sight for two to three seconds and then ran back into Mr. Frankses' view for another three seconds. Sean was flailing his hands over his head,

_____

[6] Toxicology reports indicate that the active component of marijuana, DELTA-9 THC, and phencyclidine (PCP) were present in Sean's system at the time of his death. (Report of Richard T. Callery, M.D., F.C.A.P. 2, Warminster Defs.' Mot. Ex. R.) Plaintiffs have filed a Motion in Limine to Exclude Evidence of Drugs in Sean Sullivan's System. (ECF No. 60.) We will address this Motion at trial.

"running like he was fighting off bees." (*Id.* at 117:6-7.) Mr. Franks did not see a gun in Sean's hands while he was in Mr. Frankses' view. (*Id.* at 135:19-21.)

Other neighbors who had overheard the communications between the police and Sean reported that the police did not mention a gun. David Cook never heard the officers instruct Sean to put down his weapon. (Cook Dep. 69:18-22.) Members of the Marino family likewise stated that they had never heard any of the officers instruct Sean to put his gun down or otherwise reference a weapon. (A. Marino Dep. 110:4-8, Pls.' Resp. Ex. P; K. Marino Dep. 22:1-9, Pls.' Resp. Ex. S; M. Marino Dep. 50:8-13, Pls.' Resp. Ex. Z.)

After Sean came to rest on the other side of the fence, Leporace put handcuffs on Sean and moved him to a position of concealment from the Sullivan residence. (McCaffrey Dep. 42:12-14, 43:9-11.) Cook testified that an officer approached Sean with a medical kit. (Cook Dep. 31:23-32:3.) Though Cook's view was obscured such that he could not see the upper half of Sean's body, Cook testified that the officer with the medical kit appeared to be attending to Sean, while a few other officers "were just standing there." (*Id.* at 35:12-36:9.) Cook later testified that he did not see any officers rendering medical attention to Sean. (*Id.* at 152:9-16.) Another neighbor saw an officer with what she assumed was a medical kit but did not see any of the officers rendering aid to Sean. (K. Marino Dep. 77:6-18.) Leporace testified that he performed chest compressions on Sean. (Leporace Dep. 60:13-20.) Leporace did not get blood on his hands or clothes while performing the compressions. (*Id.* at 60:21-62:17.) The police dispatch report indicates that Sean was down at 6:47 am, and a medical unit was expedited to the scene at 6:48 am. (Warminster Defs.' Mot. Ex. B at 2.) The dispatch report further indicates that

officers were rendering first aid by 6:50 am, and the medical unit arrived at the scene at 6:55 am. (*Id.*)

After the shooting, the police obtained a warrant to search the Sullivan yard and property. (Murphy Dep. 56:3-16.) The police dispatch report indicates that a firearm was recovered at 7:12 am. (*Id.*) Springfield testified that the firearm was lying on the ground toward the back of the property. (Springfield Dep. 84:1-11.) The officers later learned that the firearm that Sean had brandished was a replica Walther PPK BB gun. (McCaffrey Dep. 97:15-24.) The day after the shooting, an evidence voucher was filled out showing that a black Walther PPK BB gun recovered from the Sullivan backyard was entered into the Warminster Township Police Department's evidence system. (Verderame Dep. Ex. 5, Pls.' Resp. Ex. BB.) The Warminster Police Department did not place an evidence marker next to the BB gun while it lay in the backyard, and there are no photographs of the BB gun with an evidence marker next to it. (Decl. of Elizabeth L. McLachlan ¶¶ 41-42, ECF No. 55.) The data files for the photographs of the BB gun indicate that they were created between 1 am and 5 am on March 31, 2006—several hours before the shooting occurred. (*Id.* ¶ 43.)

In the aftermath of the shooting, the District Attorney's Office in Bucks County conducted an investigation into the actions and the Warminster and Warrington police officers during the execution of the arrest warrant on Carol Sullivan. The District Attorney's Office concluded "that the police officers acted within their authority and the use of deadly force during this confrontation was justified." (Letter from First Assistant District Attorney David W. Zellis, Warminster Defs.' Mot. Ex. D.)

Plaintiffs have voluntarily dismissed all claims against Warrington Township, Warrington Police Chief James Miller and all claims against officer Quentin Fuller except the failure to provide medical treatment claim. (*See* Stipulation of Dismissal, ECF No. 77.) The Warminster Defendants and Warrington Defendants now move for summary judgment on all of Plaintiffs' claims. The motions substantially overlap, and we treat them separately only where they raise distinct arguments.

## II. LEGAL STANDARD

A party is entitled to summary judgment when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the [party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); s*ee also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Fed. Home Loan Mortg. Corp. v. Scottsdale Ins. Co.*, 316 F.3d 431, 443 (3d Cir. 2003). Where the nonmoving party bears the burden of proof at trial, the moving party may identify an absence of a genuine issue of material fact by showing the court that there is no evidence in the record supporting the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 325 (1986); *UPMC Health Sys. v. Metro. Life Ins. Co.*, 391 F.3d 497, 502 (3d Cir. 2004). If the moving party carries this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e)(2) (stating that "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial"); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (noting that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). The nonmoving party may not avoid

summary judgment by relying on speculation or by rehashing the allegations in the pleadings. *Ridgewood Bd. of Educ. v. N.E. for M.E.*, 172 F.3d 238, 252 (3d Cir. 1999). "Where the record taken as a whole could not lead a reasonable trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). "We must construe the evidence in favor of the non-moving party, and summary judgment must be denied if there exists enough evidence 'to enable a jury to reasonably find for the nonmovant on the issue.'" *Brown v. J. Kaz, Inc.*, 581 F.3d 175, 179 (3d Cir. 2009) (quoting *Giles v. Kearney*, 571 F.3d 318, 322 (3d Cir. 2009)).

## III.    ANALYSIS

### A.    Count I:  § 1983 Excessive Force

Plaintiffs allege that Defendants Harold, Leporace, McCaffrey, and Blanchard used excessive force in attempting to take Sean Sullivan into custody. (Compl. ¶¶ 38-48.) They also allege that Defendants Springfield, Byrne, and Szymborski failed to intervene to protect Sean from their co-defendants' use of excessive force. (*Id.*)

#### 1.    *Excessive Force—Harold, Leporace, McCaffrey, and Blanchard*

A claim of excessive force is analyzed under the Fourth Amendment's objective reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 388 (1989). The Fourth Amendment safeguards "[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures." U.S. Const. amend. IV. To prevail on their Fourth Amendment claim, Plaintiffs must show that a seizure occurred, and that it was unreasonable under the circumstances. *Brower v. Cnty. of Inyo*, 489 U.S. 593, 599 (1989). Because "there can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness

requirement of the Fourth Amendment," *Tennessee v. Garner*, 471 U.S. 1, 7 (1985), we need only determine whether a reasonable jury could find that the officers' use of deadly force was unreasonable under the circumstances.

"It is unreasonable for an officer to use deadly force against a suspect unless the officer has good reason to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Lamont ex rel. Estate of Quick v. New Jersey*, __ F.3d __, 2011 WL 753856, at *5 (3d Cir. Mar. 5, 2011) (quoting *Garner*, 471 U.S. at 3 (internal quotation marks omitted)). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. Because the reasonableness inquiry is an objective one, a police officer's good or evil intentions are not relevant to the inquiry. *Id.* In measuring the reasonableness of a display of force, courts must make "allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 397. Thus, "Monday morning quarterbacking is not allowed." *Lamont*, 2011 WL 753856, at *5. Factors courts should consider in assessing the reasonableness of using deadly force include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. An officer who uses deadly force in the mistaken belief that a suspect is armed will not be found liable if the mistake is reasonable and the circumstances otherwise justify the use of deadly force. *Lamont*, 2011 WL 753856, at *5.

Plaintiffs contend that there is a genuine issue of material fact as to whether Sean had a gun in his hand when he tried to escape from police. (Pls.' Resp. 20.) They allege that the BB gun that Defendants contend Sean brandished was placed in the backyard after the shooting occurred. (*Id.* at 22.) The evidence Plaintiffs provide to support this theory includes:

•  Carol Sullivan's testimony that Sean never claimed to have a gun, and that it was instead the police who suggested that he was armed. (*See* Sullivan Dep. 137:2-4 (testifying that a police officer responded to Sean, "Oh, what? You have a gun?").)

•  Robert and Kelly Franks's testimony that they never saw a gun in Sean's hands as he ran across the Sullivan backyard. (*See, e.g.*, R. Franks Dep. 128:17-129:4 (testifying that he saw nothing in Sean's hands as he dropped from the window); *id.* at 117:6-7 (testifying that Sean was flailing his hands over his head, "running like he was fighting off bees"); K. Franks Dep. 103:20-22 (testifying that Sean was flailing his hands over his head and had nothing in his hands).)

•  David Cook's and the Marinos' testimony that they had not heard the police mention a weapon during the standoff with Sean. (*See, e.g.*, Cook Dep. 69:18-22; A. Marino Dep. 110:4-8; K. Marino Dep. 22:1-9; M. Marino Dep. 50:8-13.)

•  The absence of an evidence marker next to the gun in photographs of the gun.

•  The date and time stamps on the digital photographs of the gun, which indicate that the files were created before the shooting occurred. (*See* Pls.' Resp. Ex. MM.)

•  Investigators' failure to include in their reports any mention of the Frankses' statement that they never saw a gun in Sean's hands.

•  The 24-hour delay between the shooting and the time at which the BB gun was entered into evidence. (Verderame Dep. Ex. 5, Pls.' Resp. Ex. BB.)

•  The officers' testimony that Sean held the gun in his right hand as he ran. Sean Sullivan was left-handed. (Aff. of Carol A. Sullivan ¶ 6, Pls.' Resp. Ex. D.)

Defendants contend that there is no genuine issue of material fact as to whether Sean had a gun. (Warrington Defs.' Mot. 12; Warminster Defs.' Reply 3-8.) They argue that the Frankses' view of the Sullivan backyard is obscured by a shed, and that by the time Sean entered into the

Frankses' view, it is undisputed that he had dropped his weapon. (Warrington Defs.' Mot. 12; Warminster Defs.' Reply 5-7.) Thus, the testimony of the officers that Sean pulled a gun from his waistband after coming out of the window only to drop it while running across the backyard is not inconsistent with the Frankses' testimony, according to Defendants. (Warrington Defs.' Mot. 12; Warminster Defs.' Reply 5-7.)

Robert Franks testified that he saw Sean climb out of the window but did not see him land because his view was obscured. Although he clearly saw both of Sean's hands while he climbed out of the window, Mr. Franks was unable to say whether or not Sean had a weapon in his hands after he landed. (R. Franks Dep. 115:24-116:11 ("I lost sight from when he let go of the window.").) Similarly, while Mrs. Franks testified that she did not see anything in Sean's hands when he landed after exiting his bedroom window, Mrs. Franks moved from the window she was looking out of to a different window and did not pick Sean up again until he was on the other side of the shed that obscured the Frankses' view of the Sullivans' backyard. (K. Franks Dep. 100:3-101:9.)

We are required at this stage of the proceedings to view the facts and draw inferences in the light most favorable to the nonmovants. *Ray v. Twp. of Warren*, 626 F.3d 170, 173 (3d Cir. 2010). However, the summary-judgment standard does not require us to bend over backward to accommodate a speculative view of the facts. *See, e.g.*, *Matsushita*, 475 U.S. at 587 (stating that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Lexington Ins. Co. v. W. Pa. Hosp.*, 423 F.3d 318, 333 (3d Cir. 2005) ("Speculation does not create a genuine issue of fact; instead, it creates a false issue, the

demolition of which is a primary goal of summary judgment." (quoting *Hedberg v. Ind. Bell Tel. Co.*, 47 F.3d 928, 932 (7th Cir. 1995) (internal quotation marks omitted))).

Much of the circumstantial evidence that Plaintiffs advance in support of their theory that Sean Sullivan was unarmed is open to question. For example, Plaintiffs cite the date and time stamp on the photographs of the BB gun, asserting that the data files were created before the shooting even occurred. Plaintiffs maintain that this is evidence of a conspiracy to cover up the fact that the officers shot an unarmed man. However, *all* the pictures of the crime scene and surrounding area contain time stamps from two to five hours before the shooting occurred. (*See, e.g.*, Photo Titled DSCN0080.jpg, Warminster Defs.' Mot. Ex. E (photo of child's headboard with bullet hole and bright light streaming in the window; date and time stamp in file properties is March 31, 2006 at 1:12 am).) Far from establishing a conspiracy, the date and time stamps on the photos of the gun establish only that whoever took the photos does not know how to set the time properly on his or her computer. Nevertheless, we are satisfied that there is genuine issue of material fact as to whether Sean had a gun when he attempted to escape. Carol Sullivan's testimony that it was the police who suggested that Sean had a gun is directly contradicted by the police officers' testimony that it was Sean who announced to the officers that he had a gun. (*Compare* Sullivan Dep. 137:2-4 (testifying that officer said to Sean, "Oh, what? You have a gun?"), *with* Harold Dep. 76:20-77:5 (testifying that Sean repeatedly said, "I have a gun").) In addition, there is an issue of fact regarding whether the testimony of Kelly and Robert Franks that they never saw a gun in Sean's hands conflicts with the officers' testimony that Sean brandished a gun. Moreover, the lack of an evidence marker in the gun photographs, the delay in entering the gun into evidence, and the testimony of the neighbors regarding what the police did or did not

say during this incident all have to be weighed in determining what actually happened on March 31, 2006. It is not for courts to weigh the evidence when deciding summary-judgment motions. *See Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he is ruling on a motion for summary judgment."). A jury will have to resolve these issues.

In any event, even if the officers' initial use of force against Sean Sullivan was justified, there still exists a genuine issue of material fact as to whether the officers' continued use of force was reasonable. This conclusion is compelled by the recent Third Circuit opinion in *Lamont ex rel. Estate of Quick v. New Jersey*, __ F.3d __, 2011 WL 753856 (3d Cir. Mar. 5, 2011). In *Lamont*, the administrator of the decedent's estate brought a § 1983 action against police officers and state troopers who had shot and killed a suspected car thief, Eric Quick. The police found Quick in the woods bordering an interstate, where he had abandoned a stolen car. *Id.* at *1. The police repeatedly ordered Quick to freeze and show his hands. Quick's right hand was tucked into the waistband of his pants and gripping an unknown object. Quick removed his right hand from his waistband quickly, as though he were drawing a pistol. The officers started firing at Quick, who turned away from the officers. The officers continued firing, hitting Quick in the legs and buttocks. The police officers fired a total of 39 bullets at Quick in ten seconds. 18 of the bullets hit Quick; 11 hit him from behind. He fell and was later pronounced dead. The item in Quick's right hand turned out to be a crack pipe. *Id.* at *2.

The district court granted the defendants' motion for summary judgment, finding that Quick's sudden withdrawal of his hand from his waistband justified the officers' use of deadly

force.  The district court also rejected the plaintiff's argument that even if the use of force had

been initially justified, it became unreasonable when the officers continued firing after Quick had

ceased to be a threat.  *Id.* at *3.  The Court of Appeals reversed in part.  The panel agreed that the

officers had been reasonable in believing that Quick was drawing a gun when he removed his

hand from his waistband, noting that "[p]olice officers do not enter into a suicide pact when they

take an oath to uphold the Constitution."  *Id.* at *5.  However, the panel reversed the district court

on whether the troopers' continued use of force, even if initially justified, became excessive as

events unfolded.  *Id.* at *6.  The Court of Appeals observed that "[e]ven where an officer is

initially justified in using force, he may not continue to use such force after it has become evident

that the threat justifying the force has vanished."  *Id.*  The court was particularly troubled that 11

of the 18 bullets that struck Quick had hit him in the back.  The Court of Appeals concluded that

"in these circumstances, a jury may find that the troopers improperly continued firing after Quick

had turned away from them and no longer posed a threat."  *Id.* at 7.

Like *Lamont*, there is a genuine issue of material fact in this case as to whether it was

reasonable for the officers to continue to fire at Sean as he ran across the backyard.  The police

fired 55 shots in a suburban backyard, six of which hit Sean.  (Murphy Dep. Ex. 4; Coroner's

Report 3.)  It is undisputed that Sean dropped his gun near the rear of the Sullivan property as he

attempted to escape.  The testimony established that Sean was wounded during his flight.  (*See,*

*e.g.*, Harold Dep. 33:1-10 (expressing his belief that his first shot had hit Sean).)  It also appears

undisputed that officers continued to fire at Sean's back after he had dropped the Walther PPK

and as he reached the fence.  (R. Franks Dep. 141:14-16; Coroner's Report 3 (finding bullet entry

wounds in Sean's back).)  Under these circumstances, a jury could conclude that Officers Harold,

Leporace, McCaffrey, and Blanchard unreasonably continued to fire at Sean in their attempt to apprehend him.

### 2. Failure to Intervene—*Springfield, Byrne, and Szymborski*

Plaintiffs allege that Springfield, Byrne, and Szymborski are liable under § 1983 for failure to intervene to prevent the deprivation of Sean Sullivan's constitutional rights. (Compl. ¶¶ 38-48.) A police officer is directly liable under § 1983 if he fails to intervene when a constitutional deprivation takes place in his presence. *Stewart v. Moll*, 717 F. Supp. 2d 454, 462 (E.D. Pa. 2010) (citing *Byrd v. Clark*, 783 F.2d 1002, 1007 (11th Cir. 1986); *Putman v. Gerloff*, 639 F.2d 415, 423 (8th Cir. 1981)). However, "an officer is only liable if there is a realistic and reasonable opportunity to intervene." *Id.* (citing *Smith*, 293 F.3d at 651).

Defendants argue that Springfield, Byrne, and Szymborski had no realistic and reasonable opportunity to intervene because they were positioned in front of the Sullivan residence, far from where the constitutional deprivation took place. (Warminster Defs.' Mot. 38-39.) Plaintiffs counter that the officers' positioning "is dispositive of nothing," because Springfield organized the plan to serve the warrant on Carol Sullivan, and the other officers served the warrant in a way that escalated the situation. (Pls.' Resp. 25-27.) Plaintiffs cite *Baker v. Monroe Township*, 50 F.3d 1186 (3d Cir. 1995), for the proposition that "a senior officer involved in executing a warrant could be held liable under Section 1983 if "there [was] sufficient evidence to permit an inference that [the officer] knew of and acquiesced in the treatment the [plaintiffs] were receiving at the hands of the other officers acting under his supervision." (Pls.' Resp. 26 (quoting *Baker*, 50 F.3d at 1193 (alterations in the original)).) However, *Baker* is

inapposite. *Baker* was an action for supervisory liability, not failure to intervene, as in the instant case.

We agree with Defendants that Springfield, Byrne, and Szymborski had no "realistic and reasonable opportunity to intervene," *Smith*, 293 F.3d at 651, in the alleged deprivation of Sean Sullivan's constitutional rights. Plaintiffs attempt to avoid this conclusion by arguing that the entire encounter between the police and Sean and Carol Sullivan was a constitutional deprivation of Sean's rights. (*See* Pls.' Resp. 26-27 ("Springfield . . . directly contributed to the confrontational environment in which Sean Sullivan was killed. . . . Similarly, Byrne and Szymborski were intimately involved in the botched serving of the arrest warrant on Mrs. Sullivan.").) However, Plaintiffs cite no case law to support the proposition that officers who had no reasonable opportunity to intervene to prevent a constitutional deprivation can nonetheless be liable for failure to intervene if they were merely present on the scene before the violation occurred. Nor are we aware of any such case law.

If excessive force was used here, it was used after Sean came out of the window in the back of the house when the officers in the backyard area fired their weapons at Sean as he attempted to escape. Springfield, Byrne, and Szymborski's position in front of the Sullivan house deprived them of any reasonable or realistic opportunity to intervene in the alleged violation of Sean's constitutional rights. Summary judgment in favor of Springfield, Byrne, and Szymborski is therefore appropriate on Plaintiffs' § 1983 failure to intervene claim.

**B.      Count III: § 1983 Denial of Medical Assistance**

Plaintiffs allege an unconstitutional deprivation of medical care against Springfield, Byrne, Blanchard, Fuller, McCaffrey, Harold, Leporace, and Szymborski, in violation of the

Fourteenth Amendment's guarantee of substantive due process. (Compl. ¶¶ 62-71.) Police officers are liable for unconstitutional denial of medical assistance when there is (1) a serious medical need and (2) acts or omissions by the police officers that indicate deliberate indifference to that need. *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003). "Deliberate indifference is a 'subjective standard of liability consistent with recklessness as that term is defined in criminal law.'" *Hogan v. City of Easton*, No. 04-759, 2004 WL 1836992, at *10 (E.D. Pa. Aug. 17, 2004) (quoting *Natale*, 318 F.3d at 582). The Third Circuit has "found deliberate indifference in situations where necessary medical treatment is delayed for non-medical reasons." *Natale*, 318 F.3d at 582 (citations and internal quotation marks omitted).

While the overwhelming majority of denial of medical treatment claims occur in the prison context, liability under § 1983 is not constrained solely to prisons that fail to provide inmates with required medical treatment. *See, e.g.*, *Hogan*, 2004 WL 1836992, at *11 (finding that police officers had affirmative duty to provide medical care to citizen they had shot). Because citizens who have not been convicted of a crime cannot invoke the Eighth Amendment, these claims must proceed under the Fourteenth Amendment's due process standard. *See Cooleen v. Lamanna*, 248 F. App'x 357, 361 (3d Cir. 2007) ("[S]ubstantive due process rights are invoked by pre-trial detainees and other nonconvicted persons seeking medical care who cannot invoke the Eighth Amendment.") (non-precedential). The Supreme Court has observed that a substantive due process claim "demands an exact analysis of circumstances" because "[d]eliberate indifference that shocks in one environment may not be so patently egregious in another." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998).

It is undisputed that Sean had a serious medical need, as he had been shot six times. The only question that remains is whether Defendants exhibited deliberate indifference to that need. Plaintiffs point to the testimony of David Cook as evidence that Defendants were deliberately indifferent to Sean's medical needs. Cook originally testified that he saw an officer with a medical kit attending to Sean while the other officers stood around, though he also noted that he could only see Sean's legs at the time. (Cook Dep. 35:12-36:9.) Later, Cook testified that the officer with the medical bag did not appear to be treating Sean. (*Id.* at 76:1-12; 152:9-16.) McCaffrey testified that Leporace handcuffed Sean, and together McCaffrey and Leporace moved Sean to a concealed location, as they feared that another person could be in the house. (McCaffrey Dep. 42:3-43:11.) McCaffrey heard over the radio that an ambulance had been requested and that first-aid equipment was en route to their location. (*Id.* at 43:1-6.) McCaffrey noted that Sean was not breathing and had no pulse, and Leporace began compressions, which he continued until the ambulance arrived. (*Id.* at 43:12-22.) The police dispatch report states that Sean was down at 6:47 am, and an ambulance had been called by 6:48 am. It states that the officers were working on Sean by 6:50 am, and the ambulance arrived on the scene at 6:55 am. (Warminster Defs.' Mot. Ex. B.)

We are compelled to conclude that there is no triable issue of fact as to whether Defendants exhibited deliberate indifference to Sean's medical needs under these circumstances. There is no dispute that Defendants had expedited an ambulance to Sean's location within one minute of the shooting. The ambulance arrived within eight minutes of the shooting. Defendants attempted to render first aid to Sean in the meantime. No reasonable jury could find that

Defendants exhibited deliberate indifference to Sean's medical needs. Therefore, summary judgment will be granted in favor of Defendants as to Count III.

### C.    Count IV: § 1983 Municipal Liability

Plaintiffs allege that Warminster Township's policies or customs resulted in the deprivation of Sean Sullivan's constitutional rights. (Compl. ¶¶ 72-82.) Because municipalities are not subject to *respondeat superior* liability, municipal liability "must be founded upon evidence that the government unit itself supported a violation of constitutional rights." *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990). Thus, when a suit against a municipality is based on § 1983, "the municipality can only be liable when the alleged constitutional transgression implements or executes a policy, regulation, or decision officially adopted by the governing body or informally adopted by custom." *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996) (citing *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978)). The municipal policy or custom must be the "moving force" behind the constitutional violation such that there is a direct link between the municipal policy or custom and the deprivation of constitutional rights. *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 404 (1997).

"Establishing municipal liability on a failure to train claim under § 1983 is difficult." *Reitz v. Cnty. of Bucks*, 125 F.3d 139, 145 (3d Cir. 1997). A failure to train municipal employees will ordinarily need to result in a pattern of constitutional deprivations to establish deliberate indifference by municipal policymakers. *Berg v. Cnty. of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000) (citing *Bryan Cnty.*, 520 U.S. at 404). The Third Circuit has held that to establish § 1983 municipal liability for failure to train, discipline or control its employees, a plaintiff must "show both contemporaneous knowledge of the offending incident or knowledge of a prior pattern of

similar incidents and circumstances under which the supervisor's actions or inaction could be found to have communicated a message of approval to the offending subordinate." *Montgomery v. De Simone*, 159 F.3d 120, 127 (3d Cir. 1998) (citing *Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 25 (3d Cir. 1997)). In the absence of such a pattern, the evidence must establish that the case at bar falls within that "narrow range of circumstances" in which "a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." *Id.* (quoting *Bryan Cnty.*, 520 U.S. at 409). Thus, in the absence of a pattern of constitutional violations, Plaintiffs must demonstrate that in light of the duties assigned to the officers, "the need for more or different training is so obvious, and the inadequacy [of the officers' training is] so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Canton*, 489 U.S. at 396.

Plaintiffs contend that "Warminster Township's failure to train and supervise its officers on the township policies and customs for (1) serving arrest warrants; (2) dealing with barricaded subjects; and (3) wearing proper police uniforms directly contributed to Sean Sullivan's death." (Pls.' Resp. 30.) We examine each of these in turn.

### 1. Serving Arrest Warrants

Plaintiffs assert that Warminster Township is liable under *Monell* because it failed to properly train its officers in serving arrest warrants. (Pls.' Resp. 32-34.) However, Plaintiffs have failed to establish a triable issue as to whether Warminster's alleged failure to train its officers in proper service of arrest warrants was the "moving force" behind the shooting death of Sean Sullivan. Plaintiffs' experts opine that "[t]he presence of six officers was an excessive

show of Constructive Force that escalated a minor action into a confrontational situation." They suggest that "[l]ess confrontational courses of action would have been to have had two uniformed officers serve the arrest warrant at the Sullivan house, or to affect [sic] the arrest of Carol Sullivan during a traffic stop at a place of the officer's choosing." (Report of James A. Williams, Ph.D., & George A. Saunders 8, Pls.' Resp. Ex. J.)

Plaintiffs' experts point to no aspect of the Warminster Police Department's training or policies regarding warrant service that they consider deficient. *See Montgomery v. De Simone*, 159 F.3d 120, 127 (3d Cir. 1998) (affirming district court's grant of summary judgment where plaintiff had "point[ed] to no inadequacy in [the defendant's] police training program . . . [and] failed to allege any action or inaction by the municipal defendants that could be interpreted as encouraging [the defendant's] offensive actions"). Moreover, while we are cognizant of the Third Circuit's admonition that issues of causation in municipal liability cases are better left to a jury, *see Bielevicz v. Dubinon*, 915 F.3d 845, 851 (3d Cir. 1990), the evidence is too tenuous to establish a triable issue of fact on whether Warminster Township's policies and training on warrant service caused Sean Sullivan's death. *See id.* ("*As long as the causal link is not too tenuous*, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury." (emphasis added)). Plaintiffs' experts are silent as to how Warminster Township's alleged failure to train its officers in serving warrants was the "moving force" behind the shooting of Sean Sullivan, suggesting only that the number of officers present at the scene escalated the situation. Moreover, Sean's failure to obey the commands of the police officers and attempt to escape was a superseding cause that broke the chain of causation between Warminster Township's training and policies with regard to warrant

service and Sean's death.  *See Estate of Sowards v. City of Trenton*, 125 F. App'x 35, 42 (6th Cir. 2005) (non-precedential) (finding that decedent's conduct in drawing a gun was a superseding cause that broke the chain of causation between municipality's inadequate training and decedent's death at hands of police (citing *Bodine*, 72 F.3d at 400)).  The evidence is insufficient as a matter of law to establish a causal nexus between the municipality's training and the constitutional deprivation.

### 2. *Dealing with Barricaded Subjects*

Plaintiffs contend that Warminster Township failed to adequately train its officers in dealing with a barricaded subject.  (Pls.' Resp. 34-37.)  In support of this contention, Plaintiffs point to the deposition testimony of Chief Murphy.  Chief Murphy testified that Warminster police officers are given no additional training in barricade situations beyond the training they receive at the police academy.  (Murphy Dep. 145:10-22.)  Warminster Township counters that the officers received training in the use of force, and that the Municipal Police Officers' Education and Training Commission training manual contains a hypothetical situation that is similar to the Sullivan barricade.  (Warminster Defs.' Mot. 12-14.)

Warminster Township cites *Carswell v. Borough of Homestead*, 381 F.3d 235, 245 (3d Cir. 2004).  In *Carswell*, the Third Circuit found no genuine issue of material fact regarding a municipality's alleged failure to train police officers where the record established that officers went to annual in-service courses, and the police chief regularly updated training materials and directed the police officers to familiarize themselves with them.  *Id.*  But there is nothing in this record to establish that the officers who were involved in this shooting were trained in the Municipal Police Officers' Education and Training Commission training manual scenario that

Warminster Township cites.  There is no evidence in the record to establish that the officers were trained in a similar scenario, or that they underwent any training in dealing with barricaded subjects at the police academy or in their annual training.  To the contrary, McCaffrey testified that in his training at the academy and his continuing education, he had not encountered anything that was "geared to that specific set of circumstances."  (McCaffrey Dep. 80:11-18.)  Nor is there any evidence in the record about the annual training the officers received.  Warminster Township notes in its Motion that the officers received Act 120 and Act 180 training, though it cites no record evidence to support this and does not address whether officers receive training in dealing with barricaded subjects from their state-mandated training.  (*See* Warminster Defs.' Mot. 44.)

There is no evidence in the record showing that the officers have received any training in dealing with barricaded subjects.  As a result, we are unable to conclude as a matter of law that Warminster Township's failure to provide training on barricaded subjects was not "so likely to result in the violation of constitutional rights[] that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."  *Canton*, 489 U.S. at 396.  Summary judgment will be denied on Plaintiffs' municipal liability claim as it pertains to the officers' training regarding barricaded subjects.

### 3.     *Uniform Policy*

Plaintiffs maintain that Warminster Township failed to train its officers properly with regard to the uniform policy.  As a result, the officers—five of whom were in plainclothes on the morning of the Sullivan shooting—did not have standard issue nonlethal weapons that could have been used to subdue Sean.  (Pls.' Resp. 37-38.)

This argument fails.  The Third Circuit has made clear that they "have never recognized

municipal liability for a constitutional violation because of failure to equip police officers with non-lethal weapons." *See Carswell*, 381 F.3d at 245 (quoting with approval the Seventh Circuit's observation that "the Constitution does not enact a police administrator's equipment list" (quoting *Plakas v. Drinski*, 19 F.3d 1143, 1150-51 (7th Cir. 1994)). We likewise find that the fact that five officers were in plainclothes does not establish municipal liability under *Monell*. Summary judgment will therefore be granted as to this aspect of Plaintiffs' municipal-liability claim.

### D. Count V: § 1983 Supervisory Liability

Plaintiffs allege supervisory liability against Chief Murphy in his individual capacity.[7] (Compl. ¶¶ 83-96.) "Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1948 (2009). Rather, "each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Id.* at 1939 (noting that the unavailability of *respondeat superior* liability in § 1983 and *Bivens* actions renders the term "supervisory liability" a misnomer). To prevail on a supervisory-liability claim against a municipal employee in his or her individual capacity, plaintiffs must establish that "he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations." *Santiago v. Warminster Twp.*, 629 F.3d 121, 129 (3d Cir. 2010) (quoting *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (internal quotation marks omitted)).

Plaintiffs do not specify which of these three theories they proceed under. It is clear that

---

[7] Plaintiffs voluntarily dismissed their failure to supervise claim against Chief Miller. (*See* Stipulation of Dismissal.)

Murphy did not personally participate in the alleged violation of Sean Sullivan's rights, as he was not present on the scene at the time of the shooting. Similarly, courts applying the "knowledge and acquiescence" theory generally require contemporaneous knowledge of the constitutional deprivation and acquiescence. *See, e.g.*, *Santiago*, 629 F.3d at 130 (stating that plaintiff must allege facts making it plausible that supervisor "had knowledge of Alpha Team's use of excessive force *during the raid* and acquiesced in Alpha Team's violations" (quoting *A.M.*, 372 F.3d at 586 (internal quotation marks and alterations omitted, emphasis added))); *Baker*, 50 F.3d 1194-95 (denying summary judgment where supervising officer was present while alleged constitutional deprivation was occurring and did nothing to stop it). As it is undisputed that Murphy was not present during the shooting, neither of these two theories of supervisory liability applies. Plaintiffs must therefore demonstrate that Murphy directed others to violate Sean's constitutional rights to survive summary judgment on this claim.

Plaintiffs' evidence fails to create a triable issue of fact as to whether Murphy directed others to violate Sean's constitutional rights. Plaintiffs contend that Murphy was aware that the warrant was to be served on Carol Sullivan and did not express any concern about the plan for serving the warrant or suggest that they call her instead. (Pls.' Resp. 39.) Moreover, Plaintiffs contend that Murphy did not enforce the uniform policy, which they believe contributed to Sean's death. (*Id.*) This is insufficient to establish an issue for trial, as the evidence fails to show that Murphy affirmatively directed others to violate Sean's rights. *See Reedy v. Evanson*, 615 F.3d 197, 231 (3d Cir. 2010) (holding that plaintiff failed to establish supervisory liability despite public safety director's knowledge of investigation's progress because director had not directed subordinates to violate plaintiff's constitutional rights). Since Plaintiffs point to no evidence to

establish that Murphy directed his subordinates to violate Sean's constitutional rights, we will grant summary judgment on Count V.

### E.      Counts VI-VIII:  State-Law Claims

Plaintiffs allege state-law claims under the Wrongful Death Act, the Survival Act, and for assault and battery.  (Compl. ¶¶ 97-128.)  As we noted in our Memorandum of May 27, 2010, wrongful death and survival actions are not substantive causes of action; rather, they provide a vehicle through which plaintiffs can recover for unlawful conduct that results in death.  *Sullivan v. Warminster Twp.*, No. 07-4447, 2010 WL 2164520, at *6 (E.D. Pa. May 27, 2010) (citing 42 Pa. Cons. Stat. §§ 8301(a), 8302; *Carroll v. Skloff*, 202 A.2d 9, 10 (Pa. 1964)).  Plaintiffs' assault-and-battery claim forms the basis for their wrongful-death and survival-action claims.  *See Jones v. City of Phila.*, No. 08-3336, 2011 WL 710212, at *6 (E.D. Pa. Feb. 25, 2011) (finding that plaintiff's state-law claim of assault and battery formed the basis for wrongful death and survival action against defendant police officer).

Defendants argue that these claims are barred by the Pennsylvania Political Subdivision Tort Claims Act ("Tort Claims Act"), 42 Pa. Cons. Stat. §§ 8541 *et seq.*  (Warrington Defs.' Mot. 27-28; Warminster Defs.' Mot. 36-38.)  The Tort Claims Act provides municipal employees who are acting within the scope of their employment with immunity from suit "for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person."  42 Pa. Cons. Stat. §§ 8541, 8545.  The Tort Claims Act contains eight enumerated exceptions, none of which apply here.  *See id.* § 8542.  The Act does not grant immunity to municipal employees who engage in "willful misconduct," however.  *Id.* § 8550.  Plaintiffs must therefore establish that Defendants' actions constituted "willful

misconduct" to survive summary judgment on their state-law claims. *See id.*

"Willful misconduct" is "a demanding level of fault." *Sanford v. Stiles*, 456 F.3d 298, 315 (3d Cir. 2006) (citing *Renk v. City of Pittsburgh*, 641 A.2d 289, 293 (Pa. 1994)). "The conduct of a police officer will only constitute 'willful misconduct' if the officer committed 'misconduct which the perpetrator recognized as misconduct and which was carried out with the intention of achieving exactly that wrongful purpose.'" *Waldon v. Borough of Upper Darby*, 77 F. Supp. 2d 655, 658 (E.D. Pa. 1999) (quoting *In re City of Phila. Litig.*, 938 F. Supp. 1264, 1273 (E.D. Pa. 1996)); *see also Owens v. City of Phila.*, 6 F. Supp. 2d 373, 394 (E.D. Pa. 1998) ("The *Renk* decision construed 'willful misconduct' to mean 'misconduct which the perpetrator recognized as misconduct and which was carried out with the intention of achieving exactly that wrongful purpose.'" (quoting *In re City of Phila. Litig.*, 938 F.Supp. at 1273)).

On this record, Plaintiffs' state-law claims fail. Plaintiffs point to no evidence to establish that the officers recognized their actions to be misconduct and acted with the intention of bringing about the death of Sean Sullivan. Indeed, the undisputed fact that the ambulance was called within one minute of Sean being shot establishes that the officers did not seek to cause Sean's death. The case law cited above makes it clear that when courts analyze the actions of police officers, the gulf between unreasonable conduct and willful misconduct is a large one. *See Allen v. Dist. Attorney's Office of Phila.*, 644 F. Supp. 2d 600, 611 (E.D. Pa. 2009) (granting summary judgment on state-law claims because "[e]ven if [defendants'] mistake was unreasonable, there is no evidence suggesting that their actions amounted to willful misconduct"). Plaintiffs' evidence fails to bridge that gulf. Summary judgment will be granted on Counts VI, VII, and VIII.

### F.    Count IX:  Intentional Infliction of Emotional Distress

Plaintiff Carol Sullivan alleges intentional infliction of emotional distress ("IIED") on her own behalf against Defendants Blanchard, Harold, Leporce, and McCaffrey.[8]  The Pennsylvania Supreme Court has never explicitly recognized the tort of IIED under Pennsylvania law.  *See, e.g., Taylor v. Albert Enstein Med. Ctr.*, 562 Pa. 176, 754 A.2d 650, 652 (Pa. 2000).  The Third Circuit, however, has predicted that the Supreme Court of Pennsylvania would adopt the IIED tort as set forth in Section 46 of the Restatement (Second) of Torts.  *Williams v. Guzzardi*, 875 F.2d 46, 50-51 (3d Cir. 1989) (discussing *Chuy v. Phila. Eagles Football Club*, 595 F.2d 1265, 1273 (3d Cir. 1979) (en banc)).  Section 46 provides that:

> (1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.
>
> (2) Where such conduct is directed at a third person, the actor is subject to liability if he intentionally or recklessly causes severe emotional distress
>
>> (a) to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm, or
>>
>> (b) to any other person who is present at the time, if such distress results in bodily harm.

Restatement (Second) of Torts § 46 (1965).  We will therefore apply Section 46 here.

To prevail on a claim of IIED under Restatement § 46, a plaintiff must establish: (1) outrageous conduct by the actor; and (2) that she was present at the time the conduct occurred.  *Johnson v. Caparelli*, 625 A.2d 668, 671 (Pa. Super. Ct. 1993).  Outrageous conduct has been defined by the Pennsylvania courts as conduct that is:

---

[8] In our Memorandum of May 27, 2010, we dismissed Plaintiffs' IIED claims against Murphy, Miller, and the officers who did not fire at Sean.  *See Sullivan*, 2010 WL 2164520, at *10.

so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

Carol Sullivan testified that she witnessed Sean "go down" after being shot in the backyard of their home. (Sullivan Dep. 155:13-22.) She heard a voice over the police radio in the squad car she was sitting in say "he's down." (*Id.*) This is sufficient to establish a triable issue of fact regarding her presence when the conduct occurred. Moreover, we are satisfied that if Plaintiffs' version of the facts is accepted as true, and the police fired 55 shots at an unarmed man who was running away from them, a reasonable jury could find that it constitutes outrageous conduct. Defendants' Motion for Summary Judgment is therefore denied as to Count IX.

### G. Qualified Immunity

The doctrine of qualified immunity shields municipal employees "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (internal quotation marks omitted)). Qualified immunity is an immunity from suit, not a mere defense to liability. *Id.* (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). In *Saucier v. Katz*, the Supreme Court set forth a two-step inquiry for determining whether government employees are entitled to qualified immunity. 533 U.S. 194, 201 (2001), *overruled in part on other grounds by Pearson*, 129 S. Ct. at 818. We must first determine whether the facts, when viewed in the light most favorable to Plaintiffs, would permit a reasonable jury to find that the officers violated a constitutional right. *Id.* We have concluded that a reasonable jury could find a constitutional

injury here, *see supra* Section III.A., and we therefore move on to the second prong of the analysis: whether the constitutional right at issue was "clearly established" at the time of the alleged violation. *Saucier*, 533 U.S. at 201-02 ("If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate.").

A right is clearly established where, in light of pre-existing law, a "reasonable official would understand that what he is doing violated that right." *Hope v. Pelzer*, 536 U.S. 730, 739, (2002). We conclude that the constitutional right to be free from excessive force in the execution of a search warrant was clearly established at the time of the shooting. *See Christian v. Orr*, No. 08-2397, 2011 WL 710209, at *14 n.51 (E.D. Pa. Mar. 1, 2011) ("[T]he constitutional right to be free from use of excessive force in execution of a search warrant was . . . clearly established in 2005." (citing *Garner*, 471 U.S. at 7-8)). Viewing the facts in the light most favorable to Plaintiffs, and given the genuine issues of fact that remain in this case, we are unable to conclude as a matter of law that a reasonable officer would have believed he was authorized to use deadly force to subdue Sean Sullivan. Qualified immunity therefore does not apply here.

### H.    Punitive Damages

The Warrington Defendants argue that punitive damages are not appropriate in this action. (Warrington Defs.' Mot. 24-26.) They correctly note that punitive damages are not available for claims against municipalities or against municipal employees sued in their official capacities. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 266-68 (1981). Punitive damages are therefore not available against the Townships or against any officer whom Plaintiffs have sued in his official capacity. *See id.*

It is unclear from the Complaint whether Plaintiffs have sued the individual defendants in their official or individual capacities. We therefore look to the "course of proceedings" to determine whether Plaintiffs sued the defendant officers in their individual or official capacities. *Melo v. Hafer*, 912 F.2d 628, 635 (3d Cir. 1990), *aff'd*, 502 U.S. 21 (1991). Plaintiffs stated in their Response in Opposition to Defendants' Motion to Dismiss that officers sued in their individual capacity do not enjoy immunity under the Tort Claims Act when their actions amount to willful misconduct. (*See* Pls.' Resp. Opp. Defs.' Mot. Dismiss 12-13, ECF No. 12.) Defendants have maintained a defense of immunity under the Tort Claims Act throughout these proceedings—a defense that is available only to a municipal employee who has been sued in his or her individual capacity. We therefore conclude that Plaintiffs have sued the officers in their individual, rather than official, capacity. *See Melo*, 912 F.2d at 636 (finding that plaintiffs sued defendant municipal employee in her individual capacity because defendant "understood that plaintiffs sought to sue her in her personal capacity because she raised the defense of qualified immunity throughout the course of these proceedings, a defense available only for governmental officials when they are sued in their personal, and not in their official, capacity").

For a § 1983 plaintiff to recover punitive damages, he must establish that the defendant's conduct is "motivated by evil motive or intent, or . . . involves reckless or callous indifference to the federally protected rights of others." *Savarese v. Agriss*, 883 F.2d 1194, 1204 (3d Cir. 1989). We conclude that, viewing the facts in the light most favorable to Plaintiffs, there is a genuine issue of material fact as to whether the officers acted with "reckless or callous indifference" to Sean Sullivan's federally protected rights. Summary judgment is therefore denied as to Plaintiffs' claim for punitive damages.

## IV.     CONCLUSION

For the foregoing reasons, Defendants' Motions will be granted in part and denied in part.

An appropriate Order follows.

BY THE COURT:

_____
R. Barclay Surrick, Judge